**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ANA LEMUS,** | |
| *Plaintiff,* | |
| **v.** | **Case No. 20-cv-3839 (RCL)** |
| **DISTRICT OF COLUMBIA INTERNATIONAL CHARTER SCHOOL,** | |
| *Defendant.* | |

## <u>MEMORANDUM OPINION</u>

Orlin Cruz Lemus ("Orlin"),[1] a student with a disability, was expelled from District of Columbia International Charter School ("DCI") for threatening to shoot his math teacher. After his expulsion, Ana Lemus ("Ana"), his mother, administratively appealed to the Office of the State Superintendent of Education seeking a reversal of the expulsion. After the Office determined that Orlin's expulsion was proper, Ana appealed the administrative determination to this Court, seeking declaratory, injunctive, and compensatory relief. Both DCI and Ana moved for summary judgment. For the reasons that follow, the Court will **GRANT** DCI's motion for summary judgment, **DENY** Ana's motion for summary judgment, **AFFIRM** the administrative determination, **ENTER JUDGMENT** for DCI, and **DISMISS WITH PREJUDICE** the complaint.

---

[1] This Court's previous opinion referred to Orlin, who was a minor at time, by his initials "O.C.L." *See Lemus on behalf of O.C.L. v. Dist. of Columbia Int'l Charter Sch.*, Case Nos. 20-cv-3839 (RCL), 21-cv-0223 (RCL), 2022 WL 407151 (D.D.C. Feb. 10, 2022); Fed. R. Civ. P. 5.2. However, as will be discussed, because Orlin is now over eighteen years old and brings this suit in his own name, the Court will refer to him by his given name. *See K.P. v. Dist. of Columbia*, Case No. 15-cv-1365 (CRC), 2018 WL 6181737, at *1 n.1 (D.D.C. Nov. 27, 2018).

# I. STATUTORY FRAMEWORK

## A. Individuals with Disabilities Education Act ("IDEA")[2]

"Under the Individuals with Disabilities Education Act (known as 'IDEA'), states and territories, including the District of Columbia, that receive federal educational assistance must establish 'policies and procedures to ensure,' among other things, that 'free appropriate public education,' or 'FAPE,' is available to disabled children." *Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005) (quoting 20 U.S.C. § 1412(a)(1)(A)). Under the IDEA, school districts "must ensure that '[a]ll children with disabilities residing in the State . . . regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated.'" *Id.* at 518–19 (quoting 20 U.S.C. § 1412(a)(3)(A)). When a child with a disability is identified, an Individualized Education Program Team ("IEP Team")—a group including the child's teachers and parents—creates an Individualized Education Program ("IEP") to provide "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Id.* at 519 (quoting *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. Westchester Cnty. v. Rowley*, 458 U.S. 176, 203 (1982)); 20 U.S.C. §§ 1412(a)(4), 1414(d).

## B. IDEA Disciplinary Procedure

The IDEA provides a specific process by which a school may remove a child with a disability who violates the school's code of conduct. The relevant statutory provision and corresponding regulation provide that, in order to expel a student with a disability, the school must

---

[2] Congress revised the IDEA through the Individuals with Disabilities Education Improvement Act of 2004 ("IDEIA") and the IDEIA is now the governing statute. *Brooks v. Dist. of Columbia*, 841 F. Supp. 2d 253, 254 & n.1 (D.D.C. 2012). That said, courts use the terms IDEA and IDEIA interchangeably when discussing provisions present in both statutes. *Phillips ex rel. T.P. v. Dist. of Columbia*, 736 F. Supp. 2d 240, 245 n.3 (D.D.C. 2010). Here, the Court will use the more common "IDEA," as the IDEIA did not modify the statutory provisions relevant here.

convene a Manifestation Determination Review ("MDR") meeting. 20 U.S.C. § 1415(k)(1)(E); 34 C.F.R. § 300.530(e). The meeting must be attended by a parent of the child, a representative from the school, "and relevant members of the child's IEP Team (as determined by the parent and the [school])." 20 U.S.C. § 1415(k)(1)(E)(i); 34 C.F.R. § 300.530(e)(1). At the meeting, the attendees—together the "MDR Team"—"must review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents." 20 U.S.C. § 1415(k)(1)(E)(i); 34 C.F.R. § 300.530(e)(1).

The objective of this exercise is two-fold, namely, to determine: (1) "if the [potentially expellable] conduct in question was caused by, or had a direct and substantial relationship to, the child's disability" and (2) "if the conduct in question was the direct result of the local education agency's failure to implement the IEP." 20 U.S.C. § 1415(k)(1)(E)(i)(I)–(II); 34 C.F.R. § 300.530(e)(1)(i)–(ii). This decision is known as the "manifestation determination." 20 U.S.C. § 1415(k)(1)(E); 34 C.F.R. § 300.530(e). If the MDR Team answers both questions in the negative, "the relevant disciplinary procedures applicable to children without disabilities [including expulsion] may be applied to the child in the same manner and for the same duration in which the procedures would be applied to children without disabilities." 20 U.S.C. § 1415(k)(1)(C); *see* 34 C.F.R. § 300.530(b)(1).

### C. IDEA Due Process Hearing

If a parent of a child with a disability disagrees with the manifestation determination, the IDEA provides a right to appeal to "an impartial due process hearing," 20 U.S.C. § 1415(f), and a "right to be accompanied and advised by counsel" during such hearing. *Id.* § 1415(h)(1). A qualified impartial hearing officer presides over the due process hearing in accordance with the Act. *Id.* § 1415(f)(3). Ordinarily, in the District of Columbia, "the party who filed for the due

process hearing shall bear the burden of production and the burden of persuasion" at that hearing. D.C. Code Ann. § 38–2571.03(6)(A) (West 2015). When the dispute involves "the appropriateness of the child's individual educational program or placement," and the parent "establish[es] a prima facie case" that such IEP or placement is inappropriate, then "the public agency shall hold the burden of persuasion." *Id.* After the hearing, the hearing officer issues a determination adjudicating the complaint. 20 U.S.C. § 1415(f)(1)(E).

### D. Judicial Review

Parents "aggrieved by" the hearing officer's determination may bring a civil action in either state or federal court. *Id.* § 1415(i)(2)(A); *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 528 (2007) (noting that the IDEA "accord[s] parents independent, enforceable rights"). However, "when a child with a disability reaches the age of majority under State Law . . . all other rights accorded to parents under this subchapter transfer to the child." 20 U.S.C. § 1415(m)(1)(B). In the District of Columbia, "a child with a disability . . . who has reached the age of eighteen (18) shall be presumed to be competent, and all rights under IDEA and local law governing the delivery of special education and related services shall transfer to the child with a disability" unless a regulatory exception applies. D.C. Mun. Regs. tit. 5-E, § 3034.1 (West 2016).

The reviewing court has jurisdiction to receive the record of the administrative proceeding, to hear additional evidence at the request of a party, and "basing its decision on the

preponderance of the evidence, [to] grant such relief as the court determines is appropriate." 20

U.S.C. § 1415(i)(2)(C).

## II. FACTUAL BACKGROUND

As the parties are aware, this District has supplemented Federal Rule of Civil Procedure

56 with Local Civil Rule 7(h). In general, each party moving for summary judgment must submit

"a statement of material facts as to which the moving party contends there is no genuine issue,"

and each party must submit with their opposition "a statement of genuine issues setting forth all

material facts as to which it is contended there exists a genuine issue necessary to be litigated."

Local Civil Rule 7(h)(1). After these submissions, the Court "may assume that facts identified by

the moving party in its statement of material facts are admitted, unless such a fact is controverted

in the statement of genuine issues filed in opposition to the motion." *Id.* However, when "judicial

review is based solely on the administrative record," as here, "Paragraph (1) shall not apply." Local

Civil Rule 7(h)(2). Instead, "[i]n such cases, motions for summary judgment and oppositions

thereto shall include a statement of facts with references to the administrative record." *Id.* Taken

together, the Court interprets this District's summary judgment rules in an administrative record

case to mean that so-called "factual assertions" that are unsupported by citations to accurate

evidence in the administrative record are insufficient to create issues of material fact. Similarly,

statements of facts with accurate citations that are uncontroverted by an opposing party's

opposition are considered material facts to which there is no genuine dispute.

Here, both parties filed statements of facts. *See* Def.'s Statement of Facts ("DSOF"), ECF

No. 35-2; Pl.'s Statement of Facts ("PSOF"), ECF No. 36; Def,'s Statement of Facts in Opp'n,

ECF No. 39-1; Pl.'s Statement of Facts in Opp'n, ECF No. 40. However, plaintiff's statements

were devoid of citations to the administrative record ("AR"), ECF No. 34, save for a handful of

facts irrelevant to the motions before the Court. Plaintiff's reply, on the other hand, included some information relevant for the motions before the Court. However, Local Civil Rule 7(h)(2) mandates that "*motions for summary judgment and oppositions thereto* shall include a statement of facts with references to the administrative record." (emphasis added). The plain text of the rule does not permit parties to identify undisputed issues of material fact for the first time in a reply. Therefore, the Court will only consider the statements of facts submitted by the parties accompanying their motions for summary judgment and their oppositions but will not consider any new factual material contained in plaintiff's counsel's reply.[3] Finally, the Court cites directly to the record when necessary to address pertinent facts not raised by the parties.

### A. Orlin's Background and Disability Diagnoses

Ana is a resident of the District of Columbia and the mother of Orlin Cruz Lemus. AR at 335. Orlin is a resident of the District of Columbia and qualifies as a "child with a disability" under the IDEA. *Id.*; AR at 341. Ana and Orlin were both born in Honduras and are both native Spanish speakers. AR at 335. Ana has a limited understanding of English. AR at 1462. Orlin possesses low cognitive functioning in both English and Spanish. AR at 488.

Ana came to the United States in 2005, leaving Orlin and his two older sisters in Honduras under the care of Orlin's grandparents. AR at 335. While living in Honduras, Orlin suffered both emotional and psychological trauma. He witnessed the murder of his grandfather.[4] *Id.* Orlin further

---

[3] Specifically, the Court will not consider the new factual assertions made in the reply that were not raised in plaintiff's motion for summary judgment or opposition. *See Potter v. Dist. of Columbia*, 558 F.3d 542, 553 (D.C. Cir. 2009) (Williams, J., concurring) ("[Judges] are not like pigs, hunting for truffles buried in [the administrative record].") (internal citation omitted). Additionally, the Court will not consider new legal claims made for the first time in reply. *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008). These arguments include, among others: findings during a May 2019 MDR meeting, whether DCI feared that Orlin would carry out his threat or whether Orlin possessed a gun, testimony by Dr. Jay Lucker at the due process hearing, or an apparent claim to relief under the Americans with Disabilities Act. *See, e.g.*, Pl.'s Reply, ECF No. 49, ¶¶ 3, 4, 8, 10.
[4] It is unclear how old Orlin was when this event occurred; one report noted that he was approximately 17 months old, AR at 335, and another report noted that he was between the ages of six and eight years old, AR at 352.

suffered three serious head injuries of escalating severity between the ages of five and approximately eight years old. AR at 352. At age five, Orlin fell from some height and injured his head. *Id.* The injury required a number of stitches to treat. *Id.* When Orlin was seven years old, he was ejected from a car and again injured his head. *Id.* That injury required ten stitches to treat. *Id.* Sometime after that, Orlin was riding a bicycle on a rocky hill when he fell and hit his head, exposing his scalp. *Id.* Orlin did not receive medical treatment for that fall. AR at 1403. It is unknown if the head injuries resulted in a loss of consciousness. AR at 1415.

In 2013, when Orlin was approximately nine years old, he and his sisters migrated to the United States, unaccompanied. AR at 335. The journey from Honduras to the United States lasted approximately four months. *Id.* When the children arrived in the United States, they were detained by Immigration and Customs Enforcement officials and eventually reunited with their mother. AR at 1403. That same year, Orlin relocated to the District of Columbia and enrolled in the fourth grade at Tubman Elementary School ("Tubman"). AR at 351.

The following year, Orlin was enrolled in Tubman as a third grader. *Id.* In 2015, he was once again enrolled in Tubman in the fourth grade and proceeded to the fifth grade by the fall of 2016. AR at 458. In April 2017, he was given his first comprehensive psychological evaluation. AR at 351. A psychologist reviewed Orlin's educational record, performed a variety of tests, conducted bilingual interviews with Orlin and Ana, and observed Orlin in class to prepare the evaluation. AR at 353–61. The psychologist observed that Orlin possessed reading, mathematics, and written language skills below that of his peers and that, though he was then a fifth-grade student, his academic performance was at an approximately second or third-grade level. AR at 361. The evaluation concluded that Orlin was eligible for "special education as a student with an Intellectual Disability." *Id.* In May 2017, based on the evaluation, Tubman issued a Final

Eligibility Determination classifying Orlin with an "intellectual disability (also known as mental retardation)." AR at 1144–48. This classification rendered Orlin eligible for additional services and support outside of the regular classroom instruction under the IDEA. AR at 1143. Shortly thereafter, Tubman developed Orlin's first IEP. AR at 1163.

In August 2017, Orlin enrolled at DCI in the sixth grade. PSOF ¶ 5. In June 2019, just after Orlin finished the seventh grade, another psychologist conducted a neuropsychological evaluation at DCI's request "given [Orlin's] recent misbehaviors and concern that his initial psychological evaluation did not fully investigate prior head trauma." AR at 334. Like the first psychologist, the second psychologist conducted a variety of cognitive tests on Orlin, observed Orlin in school, and conducted bilingual interviews with Ana, Orlin, and Orlin's teachers. AR at 334–50. The second psychologist similarly concluded that the "[r]esults from [the] evaluation support continued eligibility as a student with an Intellectual Disability." AR at 341.

In July 2019, DCI issued a new Final Eligibility Determination reclassifying Orlin's disability as "Traumatic Brain Injury" or "TBI." AR at 504. During the eligibility meeting, the Team reviewed the second psychologist's report, Orlin's academic record, and both the federal and municipal statutory criteria for disability classifications. AR at 502; 34 C.F.R. § 300.306; D.C. Mun. Regs. tit. 5-E, § 3006 (West 2005). The reasoning for the classification was outlined in a written report. AR at 504–16. Ana attended the eligibility meeting. AR at 504. Even with Orlin's reclassification, he was still eligible for special education services under the IDEA. AR at 526.

**B.  Orlin's IEP and Behavioral Assessments**

Before Orlin's expulsion in February 2020, DCI developed and implemented both an IEP and a behavioral implementation plan ("BIP") for him. DSOF ¶¶ 6, 9.

Orlin's IEP was last amended in August 2019 following his disability reclassification. *Id.*
¶ 6; AR at 529–54. The IEP outlined goals for Orlin in the areas of math, reading, written
expression, emotional, social and behavioral development, motor skills/physical development, and
post-secondary transition. DSOF ¶ 6. To achieve those goals, the IEP prescribed 23 hours per
month of specialized instruction outside of the general education setting, 38.5 hours per month of
specialized instruction inside the general education setting, 120 minutes per month of behavioral
support services outside of the general education setting, and 180 minutes per month of
occupational therapy inside the general education setting. *Id.* ¶ 6; AR at 542.

Orlin's BIP was based in large part on a Functional Behavioral Assessment ("FBA")
prepared in March 2019 and implemented in April 2019. AR at 458. A pattern of misbehavior by
Orlin triggered the preparation of the FBA. *Id.* Specifically, from September 2018 through the
beginning of March 2019, or approximately two-thirds of the 2018–19 school year, Orlin
received 58 disciplinary referrals.[5] *Id.* The FBA identified the negative target behaviors to
address as "off-task behavior" and "disruptive behavior." AR at 463, 468. To address these
behaviors, the FBA recommended "noncontingent reinforcement with extinction." AR at 481.
This meant that Orlin's teachers were to give him positive reinforcement at scheduled intervals
but to refrain from giving such reinforcement if Orlin was engaging in off-task or disruptive
behavior at the specific interval. *Id.* The FBA further instructed Orlin's teachers that "[a]ll target
behaviors should be ignored, unless they are unsafe." *Id.*

Orlin's disciplinary incidents increased in number and severity after the implementation
of the FBA. From September 2019 through early January 2020, or approximately half of the

---

[5] These referrals were for: being off-task in class (12); cellphone usage (9); inappropriate language (7); skipping
class (6); leaving the classroom without permission (5); refusing to follow directions (4); headphone usage (4);
roaming (2); other (2); vandalism (2); running in the hall (2); harassment (2 total, 1 sexual); food/drink during class
(1); possession of lighter (1); trespassing (1); and play-fighting (1). AR at 458–59.

2019–20 school year, Orlin received 80 disciplinary referrals. AR at 1408. During this period, Orlin was suspended for an average of at least one day per month for activities such as gesturing the use of a firearm, displaying gang signs, using a cellphone in class, and other behavior in violation of school policy. *Id.* In the first two weeks of January 2020, Orlin received a total of five days of suspension for three separate incidents involving behaviors such as using a cigarette lighter in class, being aggressive with teachers, pointing finger guns at staff and students, and skipping class. AR at 1408–09. Around that same time, the Metropolitan Police Department ("MPD") provided credible information to DCI that Orlin was involved in a gang, possessed three cellphones, and used those cellphones to communicate with other gang members. AR at 1583. MPD suggested that DCI hold a meeting with Orlin and his parents to review his recent behavior and discuss his possible gang affiliation. DSOF ¶ 18. The meeting occurred and the attendees agreed on new behavioral expectations for Orlin including: turning his cellphone over to administrators upon arrival, agreeing not to skip class, and agreeing not to display gang signs on campus as intimidation. *Id.*

Following these events, DCI, in conjunction with Ana and DCI support staff, implemented a BIP for Orlin on January 15, 2020. DSOF ¶ 9; AR at 559. The identified target behaviors and mitigation strategy in the BIP mirrored those of the FBA. AR at 559–60. Specifically, the BIP reiterated that "[a]ll target behaviors should be ignored, unless they are unsafe." AR at 560. Furthermore, the BIP provided that if Orlin's "behavior is unsafe and cannot be ignored," then the teacher was to "follow the DCI discipline protocol." *Id.* The BIP defined "unsafe behaviors" as "behaviors that can potentially cause physical danger to [Orlin], school staff, or his classmates, *but also verbal threats or explicit language that makes others feel unsafe.*" *Id.* (emphasis added). The BIP's instruction to ignore unsafe behaviors did not mean

that the behavior went unaddressed; rather, DCI teachers were follow up with Orlin to address the behavior in private. DSOF ¶ 10.

### C. Events of January 29, 2020

On January 29, 2020, Orlin was watching a video on his computer during math class. DSOF ¶ 12. At some point he stood up and his math teacher observed him making gang signs in the light of the classroom projector. DSOF ¶ 12; AR at 570, 1706. It is unclear if other students in the class observed Orlin making the hand gestures. DSOF ¶ 12; AR at 572, 1410. Orlin's math teacher did not directly address Orlin's behavior with him and instead sent a private message to a DCI administrator informing the administrator of her observations. DSOF ¶ 13. The administrator instructed the math teacher to make an official referral of the behavior. *Id.*; AR at 576. Before the math teacher was able to make her referral, Orlin was called to the front desk for an early dismissal. DSOF ¶ 13. The dismissal was unrelated to Orlin's behavior in math class. AR at 572. Ana was present in the front office waiting for Orlin. DSOF ¶ 14.

After Orlin arrived in the front office, a DCI administrator informed Ana and Orlin that Orlin would be serving an in-school suspension the following day for displaying gang signs. *Id.* The suspension related to Orlin's conduct of displaying gang signs on campus two days earlier, after which DCI contacted Ana and MPD. AR at 1409. Orlin then "became visibly upset" and asked who reported him. DSOF ¶ 15; AR at 1409. DCI administrators identified his math teacher.[6] AR at 1409. When Orlin was told that it was his math teacher who had reported his behavior, he said that he was going to confront the math teacher and left the front office towards the classroom. DSOF ¶ 15. Orlin ignored attempts by DCI administrators to dissuade him. *Id.* At

---

[6] From the record, it is unclear if the January 27, 2020 gang-sign-throwing incident occurred while Orlin was in math class, like the January 29, 2020 incident, or if there was miscommunication between DCI and Orlin about which incident led to his suspension.

the math classroom, he confronted the teacher while in the presence of other students. *Id.* ¶ 16.
Orlin "got centimeters from her face and said, 'Why the fuck did you say I did that?'" AR at
572–74, 1409. DCI administrators instructed the rest of the students to leave the classroom.
DSOF ¶ 16. At that time, Orlin chose to leave the classroom. *Id.* While in the hallway, Orlin
stated "I'm going to shoot [the math teacher]." *Id.* ¶ 17. Two DCI administrators and Ana
overheard Orlin's statement. AR at 569–70. The math teacher did not. AR at 570.

### D.  MDR Meeting

On February 5, 2020, a MDR meeting was convened. DSOF ¶ 19. Orlin, Ana, several DCI
administrators, Orlin's special education teachers and social workers, a translator, a psychologist,
and a support person attended the meeting. AR at 603. Orlin testified at the MDR meeting. DSOF
¶ 20. He acknowledged that he said that he was going to shoot his math teacher because he was
mad but claimed that he did not say it directly to the math teacher because he had thought about it
and made a decision not to say it. *Id.* ¶¶ 20–21; AR at 604. Orlin added that he understood DCI's
rules. AR at 604. Lorena Segovia, who attended the MDR meeting as an advocate for Orlin and
Ana, testified that the MDR Team only considered Orlin's procedural rights and witness
statements from the January 29, 2020 incident. AR at 1409–10, 1413. Melody Maitland, DCI's
Director of Support Services at the time who was also present at the MDR meeting, testified that
the MDR Team reviewed a packet of materials including Orlin's IEP, BIP, FBA, evaluations, an
MDR form, the witness statements, and procedural safeguards. AR at 1413. A psychologist,
attending the MDR meeting by telephone, reviewed Orlin's psychological evaluations, FBA, and
BIP. *Id.* The MDR Team confirmed Orlin's disability classification of TBI and noted a medical
diagnosis of PTSD. DSOF ¶¶ 7, 23.

The members of the MDR meeting, including Ana, unanimously agreed that Orlin's conduct was not caused by or substantially related to his disability, TBI. *Id.* ¶¶ 24–26; AR at 604. Segovia stated that Orlin's gang involvement was the most likely cause of his behavior. DSOF ¶ 27. After the MDR Team made this determination, Segovia left the meeting. AR at 1612, 1614, 1668. Then, the MDR Team, again including Ana, unanimously agreed that Orlin's conduct was not the direct result any failure by DCI to implement his IEP. DSOF ¶¶ 24–26; AR at 605. The Team's agreement on both points was recorded in the MDR meeting notes. AR at 605. Ana signed the MDR form attesting that she understood and agreed with the decision. DSOF ¶ 28.

DCI held an expulsion hearing immediately after the MDR meeting. *Id.* ¶ 19. At the hearing, DCI determined to move forward with expulsion. *Id.* ¶ 29; AR at 587. The reason stated for expulsion was Orlin's engagement in "Tier IV behavior." DSOF ¶ 11. DCI's handbook defined "Tier IV behavior" as the "use of, threatened use, or transfer of any weapon." AR at 587, 590–91. DCI offered to provide Orlin a FAPE via an online interim alternative educational setting if Ana chose not to enroll Orlin in another educational institution. AR at 616. Ana has not alleged that DCI failed to provide an appropriate alternative educational setting. AR at 233.

### E. Procedural History

#### i. *Due Process Hearings*

On July 30, 2020, Ana, represented by counsel, filed a due process complaint with the Office of the State Superintendent of Education ("OSSE") for the District of Columbia. DSOF ¶¶ 1, 30. Ana sought not only a reversal and expungement of the expulsion, but also compensatory education for Orlin's entire tenure at DCI, alleging that DCI failed to provide Orlin's required FAPE. *Id.* ¶ 30. The Hearing Officer presiding over the action separated Ana's claims about the

expulsion from her claim alleging failure to provide a FAPE.[7] *Id.* ¶ 3. The Hearing Officer considered the expulsion portion of the hearing first because a complaint involving expulsion is entitled to expedited treatment. *Id.* The following issues were certified for the expulsion portion of the due process hearing:

1) Whether the behavior that led to [Orlin's] expulsion on February 6, 2020 was the direct result of [DCI's] failure to implement [Orlin's] IEP and [Orlin's] Behavior Plan ("BIP").

2) Whether [DCI] denied [Orlin] a FAPE by expelling him on or about February 6, 2020 despite his objectionable behavior being a manifestation of his disability.

*Id.* ¶ 30.

OSSE held hearings on Orlin's expulsion on September 22, 23, and 28, 2020. *Id.* ¶¶ 4, 31. Ana called seven witnesses, including four DCI staff members, Orlin's court-appointed attorney, a speech language pathologist, and Segovia. *Id.* ¶ 32. DCI called one witness, Maitland. *Id.* ¶ 33. Ana did not testify at the hearing. *Id.* ¶ 34.

The Hearing Officer issued a decision on October 6, 2020 finding in favor of DCI. *Id.* ¶ 35. The Hearing Officer determined that Ana bore the burden of persuasion on both certified issues and that she failed to meet that burden to demonstrate that the MDR Team erred in making their manifestation determination. *Id.* ¶ 36. Furthermore, the Hearing Officer concluded that "the evidence is overwhelming that the incident that led to [Orlin's] expulsion was not a consequence of a failure to implement the IEP or BIP." AR at 1413. Finally, the Hearing Officer concluded that there was unanimous agreement that Orlin's behavior was a result of his gang involvement, not a

---

[7] The Hearing Officer determined that DCI had denied Orlin a FAPE, and DCI appealed that decision to this Court. *See Dist. of Columbia Int'l Charter Sch. v. Lemus*, No. 21-cv-223 (RCL). This Court's review of the Hearing Officer's FAPE determination is the subject of a separate Memorandum Opinion.

manifestation of his disability, and Ana had not met her burden to demonstrate otherwise. DSOF ¶ 36; AR at 1416.

    *ii.  Instant Action*

    After the declaration that her son's expulsion did not violate the IDEA, Ana, represented by the same counsel from the due process hearing, filed this action seeking declaratory, injunctive, and compensatory sought relief under the IDEA and Title VI of the Civil Rights Act of 1964. Am. Compl., ECF No. 13. She alleges that the Hearing Officer erred in several ways during the due process hearing, such as determining that she bore the burden of persuasion and concluding that the MDR meeting complied with the IDEA statutory requirements, among others. *See id.* ¶¶ 95–118. In response, DCI moved to dismiss. Def.'s Mot. to Dismiss, ECF No. 15. DCI argued that this Court should dismiss the suit because the IDEA claims were time-barred, Ana failed to exhaust administrative remedies, and she had failed to state a cognizable Title VI claim. *Id.* at 1. The Court granted in part DCI's motion, disagreeing with DCI on its first two arguments but agreeing with the third. *Lemus on behalf of O.C.L. v. Dist. of Columbia Int'l Charter Sch.*, Case Nos. 20-cv-3839 (RCL), 21-cv-0223 (RCL), 2022 WL 407151 (D.D.C. Feb. 10, 2022). The Court accordingly dismissing the Title VI claim. *Id.* Only the IDEA claims remain.[8]

    The parties then both moved for summary judgment. Def.'s Cross Mot. for S.J., ECF No. 35; Def.'s Mem. in Supp. of Def.'s Mot. for S.J. ("Def.'s MSJ"), ECF No. 35-1; Pl.'s Mot. for S.J. ("Pl.'s MSJ"), ECF No. 36. Each filed an opposition to each other's motions. Def.'s Opp'n to Pl.'s MSJ ("Def.'s Opp'n"), ECF No. 39; Pl.'s Opp'n to Def.'s MSJ ("Pl.'s Opp'n"), ECF No. 40. DCI

---

[8] The Complaint further invoked The Rehabilitation Act of 1973. *See* Am. Compl. ¶¶ 1, 5. However, because the Complaint did not make any specific allegations regarding the Rehabilitation Act, it fails to state a claim under this statute and therefore any claim based in the Act must be dismissed. *See Cummings ex rel. J.C. v. Woodson Senior High Sch.*, 563 F. Supp. 2d 256, 259–60 (D.D.C. 2008). Even if the Complaint had properly pleaded a Rehabilitation Act claim, it would fail for the same reason that this Court dismissed the Title VI claim—the Complaint did not allege intentional discrimination. *See Lemus*, 2022 WL 407151, at *8–9; *see also Hinson ex rel. N.H. v. Merritt Educ. Ctr.*, 521 F. Supp. 2d 22, 30–31 (D.D.C. 2007).

filed a reply in support of its own motion. Def.'s Reply, ECF No. 44. Plaintiff's counsel filed a reply after twice moving to extend the deadline. Pl.'s Reply, ECF No. 47-1. Both motions are ripe for review.

## III. LEGAL STANDARDS

### A. Summary Judgment

In ordinary civil actions, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A court evaluating a summary judgment motion must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Arthridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 629 (D.C. Cir. 2010).

### B. Judicial Review under the IDEA

Under the IDEA, "[a]ny party aggrieved by the findings and decision" rendered during administrative proceedings before the local educational agency may "bring a civil action" in state or federal court "without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). The reviewing court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.* § 1415(i)(2)(C). The IDEA requires reviewing courts to afford "less deference than is conventional in administrative proceedings," *Reid*, 401 F.3d at 521 (internal quotation marks and citation omitted),

but courts are not to "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206.

The party challenging the hearing officer's determination "take[s] on the burden of persuading the court that the hearing officer was wrong." *Reid*, 401 F.3d at 521 (internal citation and quotation marks omitted). That party must demonstrate by a preponderance of evidence that the hearing officer erred. *See Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988). If neither party requests that the Court hear additional evidence, the Court may decide the case on summary judgment based on the administrative record. *Beckwith ex rel. L.B. v. Dist. of Columbia*, 208 F. Supp. 3d 34, 42 (D.D.C. 2016) (internal citation omitted).

## IV. DISCUSSION

As a threshold matter, even when not raised by either party, this Court has an independent obligation to assure itself of its subject-matter jurisdiction. *See Obaydullah v. Obama,* 688 F.3d 784, 788 (D.C. Cir. 2012). "Because standing is an element of the [Article III] case or controversy requirement, a court does not have subject matter jurisdiction if a plaintiff lacks standing." *Gulf Restoration Network, Inc. v. Nat'l Marine Fisheries, Serv.*, 730 F. Supp. 2d 157, 165 (D.D.C. 2010) (citing *In re Navy Chaplaincy*, 534 F.3d 756, 759 (D.C. Cir. 2008)). Here, Ana originally sued on her own behalf and on behalf of her son, Orlin. Am. Compl. at 1. Orlin became eighteen years old during the pendency of this lawsuit and has not been determined to be incompetent or subject to any of the exceptions provided in the District of Columbia's municipal regulations. Ana therefore no longer has standing to bring suit on his behalf because all the rights afforded to her under the IDEA transferred to Orlin on his eighteenth birthday. *See Brooks v. Dist. of Columbia*, 841 F. Supp. 2d 253, 260–61 (D.D.C. 2012) (collecting cases). Orlin, however, retains rights under the IDEA. *See, e.g., Schiff v. Dist. of Columbia*, No. 18-cv-

1382 (KBJ), 2019 WL 5683903, at *4 (D.D.C. July 20, 2022) (noting that IDEA applies to "children between the ages of three and twenty-one") (citing 20 U.S.C. § 1412(a)(1)(A); D.C. Mun. Regs. tit. 5-E, § 3002.1(a) (West 2014) (extending IDEA coverage to students in the District of Columbia until the age of twenty-two)).

Orlin, through his mother's counsel, submitted an affidavit to the Court seeking to join the suit on his own behalf and to be represented by the same counsel. Orlin Cruz Lemus Aff., ECF No. 50. However, an affidavit is not the proper procedure to add Orlin, the real party in interest—counsel should have moved to substitute Orlin for Ana pursuant to Federal Rule of Civil Procedure 17. *See Brooks*, 841 F. Supp. 2d at 261. Nevertheless, the Court will construe the affidavit as such a motion because DCI did not respond to or indicate opposition to the document, requiring counsel to submit the proper motion would needlessly delay the litigation, and clearing the standing hurdle does not change the fact that plaintiff's case fails on the merits.

Furthermore, it is well-established that this Court may treat as conceded any unopposed arguments raised in a dispositive motion. *See* Local Civil Rule 7(b); *FDIC v. Bender*, 127 F.3d 58, 67–68 (D.C. Cir. 1997). Furthermore, "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived." *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013). "Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (internal citation omitted).

Here, none of the briefing submitted by Orlin's counsel directly cites to or engages with DCI's arguments on the central issues of law and fact implicated in the Court's summary judgment opinion. Moreover, counsel's filings often fail to meaningfully respond, or fail to respond at all, to the substance of DCI's arguments even without direct citations. More broadly,

Orlin's counsel's briefs, and particularly her motion for summary judgment, fall far below the standards of professionalism that this Court expects, and that a client should be able to expect, to a level this Court has rarely seen. The briefs: lack citations to the administrative record, case law, or applicable statutory provisions, mischaracterize or wholly misunderstand the relevant facts, focus on irrelevant facts, misstate the governing law, advance arguments in unfinished draft form and, at the end of one document, even in literal outline form.[9] In sum, they are incomplete and largely incoherent. That is perhaps best encapsulated by the note written at the top of counsel's motion for summary judgment: "Near final [dated the day of the submission deadline] Time [approximately five hours before deadline]."[10]

Because "formal pleadings drafted by lawyers" are held to "stringent standards," *Estelle v. Gamble*, 429 U.S. 97, 106 (1976), the Court would be well within its discretion to deem counsel's filings as conceding most of DCI's arguments on the dispositive issues. However, out of respect for Ana and Orlin, who through no fault of their own have been placed in this position, the Court will nevertheless undertake the burden to address counsel's arguments on the merits to the extent that they are ascertainable.

The parties have not asked the Court to review any information beyond their briefing and the administrative record, and thus the Court roots its analysis in those documents. *Beckwith*, 208 F. Supp. 3d at 42. After review, the Court concludes that Orlin's counsel has not demonstrated

---

[9] Based on the Court's review of the record, it appears that counsel made similar missteps before the Hearing Officer, such as including filing incorrect documents prior the hearing, arguing irrelevant points at the hearing, and misstating the law in communications with the Hearing Officer, among others.

[10] It is difficult for the Court to express the scope and gravity of the filings' shortcomings but will attempt to do so with a few examples of the rudimentary mistakes and typographical errors contained therein. These included plainly undeveloped arguments, "DIG UP DC DISCIPLINE LAW CASES[,]" Pl.'s MSJ at 26 and "Depends in part on which doc was the IEP in force at that point[.] Or does it ?" *id.* at 27; and basic factual mistakes, "On >>> DCI made its first attempt to expel OCI on ... A properly constituted IEP Team, following IDEA's procedures, see -----," Pl.'s Opp'n at 3, "See AR at ...... (Statement filed .... )" *id.* at 7; "[F]ollowing interviews with a number of staff, [DCI] determined that all....... Should be ignored unless ..... AR at ...." *id.* at 12.

that the Hearing Officer erred, either in whole or in part, and thus DCI is entitled to summary

judgment. *Reid*, 401 F.3d at 521. Accordingly, the Court will affirm the Hearing Officer's

decision and enter judgment for DCI.

**A. The Hearing Officer Correctly Determined That Ana Bore the Burden of Persuasion at the Due Process Hearing**

Orlin's counsel argues that the Hearing Officer erred by placing the burden of persuasion

at the due process hearing on Ana—then acting on his behalf—instead of DCI. Pl.'s MSJ at 15;

Pl.'s Opp'n at 24; Pl.'s Reply at 2. DCI denies that the Hearing Officer erred and insists that Ana

retained the burden. Def.'s MSJ at 9–10; Def.'s Opp'n at 7–9; Def.'s Reply at 2.

Under District of Columbia law, the party requesting a due process hearing bears the

burden of persuasion unless (a) the dispute involves "the appropriateness of the child's

individual educational program or placement," and (b) that party establishes a prima facie case

that that the IEP or placement was inappropriate. D.C. Code Ann. § 38–2571.03(6)(A).

"Placement" is not defined by the IDEA. The D.C. municipal regulations define "placement" as

"[a] child's learning environment, classified by level of restrictiveness, as determined by the

child's IEP Team." D.C. Mun. Regs. tit. 5-A, § 3099.1 (West 2022). More broadly, "courts have

explained that a child's educational placement falls somewhere between the physical school

attended by a child and the abstract goals of a child's IEP." *Johnson v. Dist. of Columbia*, 839 F.

Supp. 2d 173, 177 (D.D.C. 2012) (internal quotation marks and citation omitted). However,

"where expulsion is at issue, a change of school is interpreted as a change in placement." *Eley v.

Dist. of Columbia*, 47 F. Supp. 3d 1, 15 (D.D.C. 2014) (internal citation omitted).

The Hearing Officer determined that the burden of persuasion remained with Ana

because the due process hearing involved the "alleged failure to implement [Orlin's] IEP and

BIP, and the appropriateness of the manifestation determination" and expressly "[did] not

involve the appropriateness of [Orlin's] IEP or placement as [Ana] did not allege that [DCI]

failed to provide an appropriate interim placement." AR at 1412.

DCI contends (a) that the Hearing Officer correctly determined that Ana bore the burden

of persuasion because an MDR decision is not a "placement" within the meaning of the IDEA,

Def.'s MSJ at 9–10; (b) even an MDR decision is a "placement," Ana retained the burden of

persuasion at the due process hearing because she did not establish a prima facie case that the

MDR decision was not appropriate, Def.'s Opp'n at 8–9; and (c) the evidence presented at the

due process hearing overwhelmingly established that Orlin's behavior was not a manifestation of

his disability—and thus the MDR decision was appropriate—regardless of which party bore the

burden of persuasion, *id.* at 9. DCI's assertions are supported by citations to case law, D.C. Code

provisions, D.C. municipal regulations, and the Code of Federal Regulations.

Orlin's counsel, on other hand, states in a conclusory fashion that DCI bore the burden of

persuasion. Pl.'s MSJ at 15. The only support given for the argument is a single citation to a

regulation, 34 C.F.R. § 300.523. *Id.* at 14–15, Pl.'s Opp'n at 24. As DCI correctly notes, this

regulatory provision does not currently exist. Def.'s Opp'n at 5. In reply, Orlin's counsel cites to

an existing and possibly applicable regulatory provision, 34 C.F.R. § 300.536. Pl.'s Reply at 2.

However, arguments raised for the first time in a reply brief will not be considered, primarily out

of fairness to the opposing party, who lacks an opportunity to respond. *See Performance*

*Contracting, Inc. v. Rapid Response Const., Inc.,* 267 F.R.D. 422, 425 (D.D.C. 2010). Thus,

Orlin's counsel is left without any support for the contention.

The Court is not convinced by DCI's argument that an expulsion, which by definition

involves a change in the child's physical location and platform for pursuing IEP goals, is not a

change of placement. In fact, the Hearing Officer appears to have concurred with the Court's

intuition. AR at 233. Regardless, the Court need not resolve this issue because it agrees with the Hearing Officer that Ana retained the burden of persuasion. Ana bore the burden by default because she was the party that requested the due process hearing. And that burden did not shift to DCI. As the Hearing Officer explained abundantly clearly to counsel via email during the due process hearing process, the burden of persuasion shifts to DCI "when the *appropriateness* of a placement is at issue." *Id.* (emphasis in original). However, the purpose of the hearing was to determine "whether *changing* the placement was appropriate." *Id.* (emphasis in original). Put differently, the purpose of the due process hearing was to determine if DCI acted appropriately in the process of removing Orlin from DCI, not whether DCI was an appropriate educational setting for Orlin. Furthermore, because Ana did not allege that DCI failed to provide an appropriate alternative setting, the burden did not shift from Ana.

Thus, the Hearing Officer did not err in determining that Ana bore the burden of persuasion and DCI is entitled to summary judgment on this point.

### B. The Hearing Officer Correctly Determined That Ana Failed to Prove That Orlin's Behavior Was a Direct Result of DCI's Failure to Implement the IEP or BIP

Orlin's counsel argues that the Hearing Officer erred in upholding the MDR Team's conclusion that his behavior was not a direct result of DCI's failure to implement his IEP or BIP because the Hearing Officer did not specifically find that the IEP and BIP were implemented or that the MDR Team reviewed them. Pl.'s MSJ at 12–13, 16–17; Pl.'s Opp'n at 20. DCI's response is that ample evidence before the MDR Team and the Hearing Officer demonstrated that DCI implemented and followed both the IEP and BIP and that Orlin's behavior was not a direct result of any implementation failure. Def.'s MSJ at 10–12; Def.'s Opp'n at 9.

Both the IDEA and the corresponding regulations require that the MDR Team "review all relevant information in the student's file, including the child's IEP, any teacher observations, and

any relevant information provided by the parents20 U.S.C. § 1415(k)(1)(E)(i); 34 C.F.R.

§ 300.530(e)(1). The focus of such an inquiry is to determine "if the conduct in question was the

direct result of the local education agency's failure to implement the IEP." 20 U.S.C.

§ 1415(k)(1)(E)(i)(I)–(II); 34 C.F.R. § 300.530(e)(1)(i)–(ii).

      The Hearing Officer noted that Segovia and Maitland offered conflicting accounts as to

whether the MDR specifically reviewed or discussed Orlin's IEP or BIP. AR at 1413. That said,

the Hearing Officer concluded that "the evidence is overwhelming that [the] incident that led to

[Orlin's] expulsion was not a consequence of a failure to implement the IEP or BIP." *Id.* In

reaching this conclusion, the Hearing Officer examined record evidence and testimony presented

at the due process hearing supporting the implementation of both the IEP and BIP.

      The Court agrees with the Hearing Officer for several reasons, not the least of which

being that the Hearing Officer reasonably concluded that Segovia was not a credible witness on

this topic because she left the MDR meeting before the MDR Team even began discussing the

question of whether Orlin's behavior was a direct result of a failure to implement the IEP or BIP.

AR at 1618. Maitland, on the other hand, was present during the whole MDR meeting, making

her testimony more credible on this point. AR at 1677. Furthermore, despite Orlin's counsel's

claim that the record does not contain any written, signed documents showing that the MDR

Team discussed whether the IEP and BIP had been implemented, Pl.'s MSJ at 16–17, all of the

members of the MDR Team in this case did, in fact, sign a document to that effect, even though

the IDEA does not require it.[11] AR at 605, 611.

      The Court's own review of the record confirms that Orlin had an IEP in place at the time

of his expulsion. The IEP contained an area of concern regarding Emotional, Social, and

---

[11] These signatures, along with notes from the meeting and testimony from witnesses at the due process hearing, demonstrate that the group's decision was unanimous.

Behavioral Development. AR at 539–40. To address this concern, the IEP described two goals for Orlin: (1) increase awareness and verbalization of his feelings and (2) utilize age-appropriate coping strategies and self-expression methods. AR at 540. The IEP prescribed 120 minutes of behavioral support services per month to work toward these goals. AR at 542. Orlin's progress was to be evaluated weekly. AR at 540.

The Hearing Officer credited the testimony of Tatiana Bien-Aime, a DCI social worker and who worked with Orlin on these goals, as evidence supporting the implementation of the IEP. AR at 1413. Bien-Aime testified that, between September 2019 and January 2020, Orlin had made some progress toward achieving the first goal but "not much" progress with respect to the second goal. *Id.* The Hearing Officer further reviewed DCI's behavioral support services tracker, noting that Orlin received at least 120 minutes of behavioral support services, as required by the IEP, during September and October 2019. *Id.* During the months of November 2019, December 2019, and January 2020, Orlin received between two-thirds or half of the prescribed monthly behavioral support services due to a combination of Orlin's increasing absences, one absence by Bien-Aime, and sessions scheduled during school breaks. *Id.* Based on this evidence, the Hearing Officer concluded that "there is no persuasive evidence that [DCI] failed to provide the [behavioral support services] prescribed in [Orlin's] IEP."[12] *Id.*

Orlin's counsel failed to demonstrate that this finding was incorrect. In addition to the evidence cited by the Hearing Officer, Maitland testified that the behavioral support services were implemented as outlined in the IEP. AR at 1674–75. Maitland relayed comments from Ana herself who expressed her thanks to the IEP Team for supporting Orlin. AR at 1672.

---

[12] The Court is troubled that DCI apparently believed it acceptable to schedule a portion of the mandated monthly needed behavioral support services during school holidays, when such services were inaccessible. AR at 1413. Nevertheless, the Court agrees with the Hearing Officer's conclusion.

Along with the IEP, Orlin had a BIP in place at the time of his expulsion. The BIP identified his target behaviors as "off-task behavior" and "disruptive behavior," and required that "[a]ll target behaviors should be ignored, unless they are unsafe." AR at 1413. The BIP defined "unsafe behaviors" as "behaviors that can potentially cause physical danger to [Orlin], school staff, or his classmates, but also verbal threats or explicit language that makes others feel unsafe." AR at 560.

At the due process hearing, Ana argued that the Orlin's behavior in math class (displaying gang signs) was not unsafe and that Orlin's math teacher violated the BIP by failing to ignore the behavior. AR at 1413. The Hearing Officer rejected this argument for several reasons. First, the Hearing Officer appeared to agree with Ana that displaying gang signs is not an inherently unsafe behavior, but noted that the math teacher complied with the BIP by not directly confronting Orlin about it and instead reporting the conduct to DCI officials. *Id.* The Hearing Officer reiterated that evidence showed that "ignore" in the BIP did not mean "take no action," rather, teachers were expected not to publicly confront Orlin about unsafe behavior. *Id.* Second, Orlin was expelled for threatening use of a weapon against a teacher, and since such conduct *is* inherently unsafe, DCI did not violate the BIP by not ignoring it. *Id.* Here, Orlin's counsel again argues that DCI violated the BIP. Pl.'s Opp'n at 21; Pl.'s Reply at 7. The Court readily rejects that contention and concurs with the Hearing Officer's conclusion.

Similarly, Orlin's counsel takes issue with DCI's approach to Orlin's FBA, the predecessor to his BIP, by claiming that DCI violated Orlin's FBA by not ignoring his behavior in the fall of 2019 and early 2020 and instead making disciplinary referrals for those behaviors. Pl.'s Opp'n at 21–22. This argument fails for the same reason as the previous argument—both the FBA and BIP instructed teachers not to confront a student about the target behavior, though

teachers were clearly permitted to make referrals or address the behavior in private. Moreover, Maya Stewart, DCI's principal, testified at the due process hearing that ignoring target behaviors was consistent with the strategy outlined in the FBA and BIP. Def.'s Reply at 9–10; AR at 1581–82. Orlin responds by claiming that the testimony of his case manager, Frankie Seobron, undermines Stewart's assertion. Pl.'s Opp'n at 21; Pl.'s Reply at 7. Seobron's testimony does not. AR at 1463–87.

The Court agrees with DCI that "there is no persuasive evidence that DCI failed to provide the behavior support services prescribed in the student's IEP." Def.'s MSJ at 12. Even if Ana "had proven that these services were not implemented, she offered no evidence whatsoever to suggest that the conduct in question was the direct result of [Orlin] missing these services." Def.'s MSJ at 12 (internal quotation marks omitted). Therefore, the Hearing Officer did not err in determining that Ana failed to demonstrate that Orlin's conduct was a direct result of a failure to implement the IEP or BIP and DCI is entitled to summary judgment on this point.

### C. The Hearing Officer Correctly Declined to Examine Whether Orlin's IEP Was Adequate

Orlin's counsel claims that the IDEA's disciplinary procedures mandate that the MDR Team determine that the IEP was adequate and that the Hearing Officer erred when not reviewing the manifestation determination under this lens. Pl.'s MSJ at 13; Pl.'s Opp'n at 22; Pl.'s Reply at 1. DCI correctly notes that counsel "fails to cite to any legal authority to substantiate this contention." Def.'s Opp'n at 5. What is more, "[t]he plain language of the law clearly does not include a requirement that the IEP determine the 'adequacy' of the IEP as part of the manifestation determination." *Id.* All that the MDR Team was statutorily required to do was review Orlin's IEP and determine if the IEP had been implemented. As previously discussed, evidence before the Hearing Officer unequivocally showed that the MDR Team did both.

26

Because the Hearing Officer did not err in not addressing the adequacy of Orlin's IEP, DCI is entitled to summary judgment on this point.

**D. The Hearing Officer Correctly Determined That the MDR Team Reviewed All Relevant Information in Determining That Orlin's Behavior Was Not a Manifestation of His Disability**

In one of the more inscrutable portions of the summary judgment motion, Orlin's counsel appears to insist generally that the MDR Team did not "consider all relevant information" as required by the IDEA, and particularly that the MDR Team did not consider that he suffered from PTSD or that his behavior was a manifestation of his PTSD. Pl.'s MSJ at 12; Pl.'s Opp'n at 27; Pl.'s Reply at 7. Elsewhere in the filings, counsel points to specific procedural errors at this stage of the MDR meeting, such as the lack of evidence demonstrating that the MDR Team consulted the definition of TBI and that the MDR Team did not read relevant information together as a group. Pl.'s MSJ at 16–17. Counsel does not provide any legal support—based in statute, case law or otherwise—to support those contentions. DCI disagrees with all of Orlin's counsel's claims and a few that counsel did not raise. *See, e.g.*, Def.'s MSJ at 14–18; Def.'s Opp'n at 4–7. Every version of Orlin's counsel's argument fails.

The IDEA mandates that the MDR Team "shall review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents." 20 U.S.C. § 1415(k)(1)(E)(i). Information is "relevant" if it is "relevant to the determination of whether the conduct leading to th[e] disciplinary incident was a manifestation of [the student's] disability." *Sch. Bd. of the City of Norfolk v. Brown*, 769 F. Supp. 2d 928, 947 (E.D. Va. 2010). In other words, all that the IDEA "requires is that, before reaching a manifestation determination, the Team must review the information pertinent to that decision." *Fitzgerald v. Fairfax Cnty. Sch. Bd.*, 556 F. Supp. 2d 543, 559 (E.D. Va. 2008).

The MDR Team met on February 5, 2020 to determine, in part, if the conduct in question was caused by, or had a direct and substantial relationship to Orlin's disability. The administrative record reflects that the MDR Team reviewed Orlin's evaluations and diagnostic results, information from Ana, observations of Orlin, and other documents to answer this question. Based on this review, the MDR Team confirmed his disability classification of TBI and his medical diagnosis of PTSD. While TBI is a recognized disability under the IDEA, PTSD is not. 34 C.F.R. § 300.8(a). Therefore, even if Orlin's conduct was a manifestation of his PTSD, the MDR Team would not have erred in concluding that Orlin's conduct was not a manifestation of TBI, his only disability protected under the IDEA. Orlin has not pointed to any additional evidence that the MDR Team should have reviewed.[13]

Finally, Orlin's counsel's arguments regarding the specific procedural problems with the manifestation determination are contradicted by the law. As DCI observes, there is no statutory or regulatory provision requiring the MDR Team to review the definition of TBI. Def.'s Opp'n at 6. Nor does Orlin's counsel offer one. To the extent that counsel's argument is that the MDR Team failed to determine whether he did, in fact, meet the statutory definition of TBI, that is contradicted by both the facts and law. The record demonstrates that the team did, in fact, review the statutory definition. AR at 502. Regardless, eligibility determinations, not manifestation determinations, are the proper procedures for determining whether the child is a child with a disability for IDEA purposes. *See N.G. v. Dist. of Columbia*, 556 F. Supp. 2d 11, 16 (D.D.C. 2008). And regarding the assertion that the MDR Team did not read the information together as a group, "the plain text of the statute does not require each member of the meeting to personally

---

[13] If Orlin's counsel's argument is that the MDR Team failed to consider a report by Dr. Jennifer Christman, Pl.'s Opp'n at 15, this, too, is unavailing. The Hearing Officer properly excluded the report because it was not prepared until seven weeks *after* the MDR meeting. AR at 1415 n.74. Because the report was not available to the MDR Team, it was not among the relevant information to be reviewed at the time of the manifestation determination.

evaluate every piece of the information during the meeting." *Gloria V. v. Wimberley Indep. Sch. Dist.*, No. 1:19-CV-951-RP, 2021 WL 770615, at *13 (W.D. Tex. Jan. 5, 2021).

For the above reasons, the Hearing Officer did not err in concluding that the MDR Team reviewed all relevant information when determining that Orlin's conduct was not a manifestation of his disability, and DCI is entitled to summary judgment on this point.

### E.   The Hearing Officer Correctly Determined That Ana Failed to Prove That Orlin's Behavior Was a Manifestation of His Disability

In a related but somewhat distinct point, Orlin's counsel argues that the Hearing Officer erred by finding that Ana had not met her burden to produce evidence that Orlin's conduct was a manifestation of intellectual disability or TBI.[14] Pl.'s MSJ at 16–17; Pl.'s Opp'n at 11; Pl.'s Reply at 5; AR at 1411. DCI counters that the Hearing Officer was correct. Def.'s MSJ at 12–14; Def.'s Opp'n at 9; Def.'s Reply at 10.

The Hearing Officer referenced testimony from both Segovia and Maitland in support of the contention that Ana had not met her burden. As for Segovia, the Hearing Officer observed that it was Segovia's testimony that she and Ana "agreed that [Orlin's] threat was not the product of [his] disability, but was due to [his] association with 'negative peers,'" and both Segovia and Ana signed the MDR paperwork affirming this understanding. AR at 1416. Maitland testified that Segovia stated that it was her opinion that Orlin's conduct was a product of his gang activity. *Id.* Ana did not testify at the hearing or in any way indicate a disagreement with Segovia or Maitland's statements. *Id.* In fact, the testimony was supported by objective disciplinary reports

---

[14] Another variation of this argument is that the Hearing Officer erred by focusing on whether Orlin's disability was "Intellectually Disability" or TBI, presumably instead of considering the possibility that Orlin might possess both disabilities or others. *See, e.g.*, Pl.'s MSJ at 18. The Hearing Officer's identification of Orlin's disability of TBI at the time of his expulsion was accurate based on Orlin's most recent Final Eligibility Determination. Furthermore, the IDEA requires that the MDR Team, whose actions the Hearing Officer reviewed, focus only on Orlin's documented disability under the IDEA, as the MDR Team must determine if Orlin's conduct was a manifestation of that disability. Therefore, the Court rejects this argument as well.

in the record, illustrating that "[Orlin's] aggressive behavior towards others seemed to escalate rapidly in January 2020 along with apparent gang affiliation. Until then, while [Orlin] had continually violated school rules, the infractions were relatively minor." AR at 1415. Moreover, as the Hearing Officer noted, Ana did not offer any evidence that Orlin's conduct was related, either directly or indirectly, to his PTSD. *Id.*

The Hearing Officer did not err in concluding that Ana did not meet her burden to demonstrate that Orlin's conduct was a manifestation of TBI, his protected disability, or PTSD, his medical diagnosis. Therefore, DCI is entitled to summary judgment on this point.

\* \* \*

Orlin's counsel has failed to prove to this Court that the Hearing Officer committed any of the errors alleged. Accordingly, the Court must affirm the Hearing Officer's decision. *Reid*, 401 F.3d at 521; *Kerkam*, 862 F.2d at 887.

## V. CONCLUSION

For the foregoing reasons, the Court will **GRANT** DCI's motion for summary judgment and **DENY** Orlin's motion for summary judgment. Accordingly, the Court will **AFFIRM** the Hearing Officer's determination and **ENTER JUDGMENT** for DCI. A separate Order shall issue.

SIGNED this _____27ᵀᴴ_____ day of March, 2023.

Royce C. Lamberth
United States District Judge